[Cite as *State v. Ridenour*, 2023-Ohio-2713.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2022-04-017 |
| | : | O P I N I O N |
| - vs - | | 8/7/2023 |
| | : | |
| DAVID C. RIDENOUR, | : | |
| Appellant. | : | |

CRIMINAL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case No. 20CR37374

David P. Fornshell, Warren County Prosecuting Attorney, and Kirsten A. Brandt, Assistant Prosecuting Attorney, for appellee

Michael J. Trapp, for appellant.

**BYRNE, J.**

{¶ 1} David Ridenour appeals from his conviction for rape in the Warren County Court of Common Pleas. For the reasons that follow, we affirm Ridenour's conviction.

**I. Procedural and Factual Background**

{¶ 2} In October 2020, a Warren County grand jury indicted Ridenour on one count of rape in violation of R.C. 2907.02(A)(2), a felony of the first degree, with a repeat violent offender specification pursuant to R.C. 2941.149(A). The indictment stemmed from

allegations that Ridenour raped the victim while the victim was a guest in Ridenour's apartment. The matter proceeded to a two-day bench trial. We will summarize the testimony of the trial witnesses below.

## A. State's Case

### 1. Sara's Testimony

{¶ 3}   "Sara"[1] testified that in October, 2020, she was living with her boyfriend, "Brad," at the Guest Inn in Lebanon, Ohio. They were living at the Guest Inn because Sara had previously been living with her mother and her mother's boyfriend, who was "unstable."

{¶ 4}   On the evening of Friday, October 16, 2020, Sara and Brad were drinking in their hotel room before going out to a bar for the evening. Sara drank one "Four Loko" malt liquor beverage before they left for King's Bar at approximately 8:00 p.m.

{¶ 5}   At King's Bar, Sara and Brad met their friend, "Doug." Sara drank Bud Light at the bar; she estimated she had two Bud Lights. Ridenour, who neither Sara nor Brad knew, was also at the bar. At some point, Brad started talking to Ridenour.

{¶ 6}   Due to COVID-19 restrictions in place at the time, the bar closed at 10:00 p.m. Brad and Ridenour began talking about going to Ridenour's apartment to continue drinking after the bar closed. They agreed to do so, and so, after the bar closed, Sara, Brad, Doug, and Ridenour all left the bar together. After they left the bar, Doug broke off from the group and went home.

{¶ 7}   Sara testified that on the walk to Ridenour's apartment, Ridenour made some "sexualized" comments about the way she was dressed and her body, which she laughed off. Sara, Brad, and Ridenour entered Ridenour's apartment and started talking about "random things." Photographs admitted into evidence showed that Ridenour resided in a small studio apartment. In the main living area, there was a dining table, a couch, and a

---

1. For privacy and readability, we will refer to the victim and her acquaintances using fictitious names, rather than initials.

bed behind the couch.

{¶ 8} Inside the apartment, Ridenour offered Sara beer, which she declined. Brad drank some of the offered beer. Ridenour also offered Sara and Brad a bottle of "Ole Smoky" moonshine, which Sara described as being in a "little mason jar." Sara had one shot of the moonshine and did not continue drinking it because she did not like it. However, Sara estimated that Brad drank one quarter of the mason jar. Sara said that Brad was intoxicated and became "loud and goofy." Brad eventually stopped talking and fell asleep on the couch.

{¶ 9} Sara tried to wake Brad up, but he was nonresponsive. Ridenour then started talking to Sara about having sex with her. He said that he and Brad had discussed it earlier that night and that Brad told him it was "okay." Sara testified that she was "not onboard with that" and told Ridenour the same. But Ridenour continued to "press it."

{¶ 10} Sara continued to try to wake up Brad, but he would not wake up. Ridenour then grabbed Sara and led her over to his bed. Sara kept saying she was not comfortable and that she wanted to leave. Ridenour did not allow her to leave. He took off Sara's shirt and pants.

{¶ 11} Sara watched Ridenour put on a condom. He penetrated her vaginally with his penis. Ridenour laid on top of her and grabbed her arms. She did not fight back. She was scared and "just didn't." She tried to wake Brad up by calling his name, but he did not respond. Sara was adamant that she did not consent, did not indicate to Ridenour that she wanted him to engage in that sexual behavior, and made it very clear to him that she was not interested in sex.

{¶ 12} Sara stated that Ridenour raped her for 10 to 15 minutes. Afterward, she got up and "threw" her clothes back on. She could not find one piece of clothing, a long-sleeved T-shirt that was gray or blue and had a surfboard on it. During this portion of her testimony,

the state showed Sara an exhibit, a photograph of a blue shirt lying on pavement. Sara agreed that the photograph depicted her missing shirt.

{¶ 13} Sara stated that she grabbed Brad's jacket and put it on him. She then forced Brad to stand up and walk out of the apartment with her. She estimated that it took 10 minutes to get Brad out of the apartment. While she was trying to leave the apartment, Ridenour asked her if she was "okay." She told him she was okay.

{¶ 14} Sara and Brad walked back to the Guest Inn. She struggled to keep Brad upright. He kept falling over and he had to lean on her the entire time. She was able to get him back to the hotel room and to lay him down. She took a shower and went to bed. At that point, she had not thought about calling the police. She testified that she had not really processed what happened.

{¶ 15} Sara testified that at 9:00 or 10:00 a.m. the next morning, October 17, 2020, Brad woke up on his own and woke her up. He asked her how he got back to the hotel room. She told him what happened. Brad became really upset and said that they needed to call and report what occurred.

{¶ 16} They called police, who arrived on scene and questioned them. The police took photographs of Sara's body. Photographic exhibits introduced at trial depicted bruising on the inside of both of Sara's arms. Other photographs depicted bruising on her thigh and buttock area. Sara testified that she believed that the bruising on her arms was from Ridenour holding her on the bed and that those bruises were not there prior to October 16, 2020. However, Sara said that the thigh/buttock bruising occurred before the incident and was from skateboarding.

{¶ 17} After speaking with police, Sara went to the hospital. However, at the hospital she refused the sexual assault examination. She explained that she did not want to do it because she "didn't want anybody to touch me."

- 4 -

{¶ 18} When questioned about Brad's tolerance for drinking, Sara said that she was familiar with it and that even when he drank a lot, he typically "holds it well" and "doesn't just pass out early like that."

{¶ 19} On cross-examination, Sara denied that she went to a Speedway gas station after leaving Ridenour's apartment. Sara stated that she and Brad went directly home to the Guest Inn. She also denied that Brad took the mason jar of moonshine with him upon leaving the apartment.

### 2. Brad's Testimony

{¶ 20} Brad testified that he drank two Bud Lights while at King's Bar. He went outside to smoke a cigarette and started talking to Ridenour. He remembered "it got a little weird" because Ridenour showed Doug a website that was like a "backpage" website for escorts.

{¶ 21} Brad further testified that when they arrived at Ridenour's apartment, Ridenour produced the Ole Smoky moonshine. Ridenour got himself a Bud Light. Brad began drinking the moonshine. Sara tasted it, but said it tasted "a little weird." Brad was not sure how much he drank but he thought he had probably six to eight drinks but "they weren't huge." Ridenour did not drink the moonshine and only drank Bud Light.

{¶ 22} Brad said he felt intoxicated but did not feel "weird." The last thing he remembered was watching Sara go into the bathroom while he was standing in front of the couch and talking with a cigarette in his hand. He did not remember watching Sara come out of the bathroom. He recalled nothing after that point until he woke up in his hotel room around 9:00 a.m. the next day. He did not know how he got there. Sara was still asleep, so he woke her and asked her what happened and asked whether "I was like a fool last night?" She told him she left the bathroom and he was "passed out" with his face on the couch and a cigarette in his hand. She said that Ridenour grabbed her. She started

screaming for Brad, but he was unresponsive. She told him that Ridenour then sexually assaulted her.

{¶ 23} Brad said that he did not understand what happened because he was only "mildly intoxicated" that evening. He said he never "black[s] out" and that it was very unusual.

{¶ 24} Brad denied that he ever told Ridenour that he was offering Sara up to have sex for money. And he denied that he ever went back to Ridenour's apartment to demand that Ridenour pay him money for having sex with Sara.

{¶ 25} On cross-examination, defense counsel asked Brad if he was aware of how Sara got bruising on her legs. Brad stated he was aware, and that it was because "your client assaulted my girlfriend." Defense counsel then indicated that Sara had testified she got the bruises from skateboarding. Brad denied that Sara skateboarded.

{¶ 26} When asked if he could recall taking the jar of moonshine with him when he and Sara left Ridenour's apartment, Brad responded that he could not remember anything. However, he said that Sara told him that Ridenour handed him the moonshine as they were leaving and that at some point, he dropped the jar. Brad said that he saw the jar the next day when he was driving over to Ridenour's apartment with a police officer. He said he told the police to grab that jar because he thought he had been drugged.

### 3. Patrolman Holmes' Testimony

{¶ 27} Patrolman Holmes of the Lebanon Police Department testified that he responded to the Guest Inn to investigate a reported sexual assault. Brad relayed to him what had occurred. Sara was quiet and relatively timid. Sara told him that bruising on her arms was from where Ridenour had held her down. Sara stated that there was a light blue "Hurley" jacket that she could not find and had possibly left at Ridenour's apartment. Patrolman Holmes stated that he searched the hotel room but did not find the missing

Hurley jacket.

{¶ 28} Patrolman Holmes testified that he was present when police subsequently executed a search warrant at Ridenour's apartment. When police arrived, they observed a male leaving the residence in a vehicle. Someone contacted the individual and discovered it was Ridenour's father.[2] This man subsequently drove away.

{¶ 29} In the roadway where the vehicle had been, Patrolman Holmes observed a jacket on the ground. It was in an area of the road that should have been within the lane of travel on a very busy road, but it did not appear to have been run over. It was Sara's missing Hurley jacket. Police recovered the lid from a moonshine jar in a trash can in Ridenour's kitchen. They also found a used condom wrapper in the trash but found no condom.

### 4. Officer O'Neill's Testimony

{¶ 30} Officer O'Neill of the Lebanon Police Department testified that the lead detective on the case asked him to view surveillance video at the Guest Inn that would capture any movement occurring outside of the hotel room where Sara and Brad were staying. He reviewed footage from October 17, 2020, starting at 8:00 a.m. and until 11:00 a.m., when police arrived at the Guest Inn. During that time, he did not see any movement indicating any person coming or going from Sara and Brad's hotel room.

### 5. Detective Trout's Testimony and Ridenour's Recorded Interview

{¶ 31} Detective Trout of the Lebanon Police Department, the lead investigator, testified that he interviewed Ridenour at the police station. The interview began at approximately 4:30 p.m. on October 17, 2020. The state played the recorded interview at trial, which interview lasted approximately two hours.

{¶ 32} During the interview, Ridenour stated that he was at King's Bar when a guy (Brad) approached him with a girl (Sara). Brad asked if Ridenour wanted to "hang out."

---

2. Another witness clarified that it was actually Ridenour's stepfather.

They all left the bar and went to his apartment at 10:00 p.m. Back at the apartment, Brad told Ridenour that Sara would give him oral sex for five dollars. Sara then "forcefully" pulled his pants down and gave him oral sex. Sara then gave Brad oral sex. Ridenour said that Brad then told him that he could have vaginal sex with Sara for 25 dollars. Ridenour attempted to decline the offer, saying "No no no." But Brad kept on encouraging him to have vaginal sex with her, using more graphic terms. Ridenour stated he was uncomfortable. But he stated that he did ultimately have consensual sex with Sara. He said that he had sex with her, using the "doggie style" position the entire time.

{¶ 33} Ridenour told Detective Trout that both Sara and Brad drank the moonshine he provided them, and that Sara took the moonshine with her when they left. Ridenour stated that Brad never "passed out" but that "he fell" and Ridenour helped pick him up. Sara "carried" Brad out of the apartment. They left Ridenour's apartment at around 2:00 a.m. on October 17.

{¶ 34} Ridenour told Detective Trout that Brad came back to his apartment later that morning, at either 9:00 a.m. or noon. Brad asked him for 25 dollars, and Ridenour paid him.

{¶ 35} While Ridenour was explaining this version of events, Detective Trout commented that it made no sense that Sara and Brad would accuse Ridenour of rape if they were engaged in a prostitution business and Ridenour paid them as agreed. Ridenour agreed that it did not make any sense. He said he could not explain it.

**B. Defense Case**

**1. David Ridenour's Testimony**

{¶ 36} Ridenour began his trial testimony by explaining that he forgot to tell Detective Trout about his visit to a Speedway gas station the night of October 16 with Sara and Brad. He stated that after he, Brad, and Sara went to his apartment, they left the apartment at around 11 p.m. or midnight to go to Speedway so that he could buy cigarettes. He had

already had sex with Sara at the time they went to Speedway.

{¶ 37} When they arrived at Speedway, Ridenour saw a man named McQueary who had tattoos on his face, and who had just "came out of prison, or jail." McQueary was sitting outside of the Speedway and asked Ridenour for a cigarette. Brad then approached McQueary and propositioned McQueary to have sex with Sara for 25 dollars. Ridenour claimed that he did not know McQueary or know anything about him.

{¶ 38} Ridenour testified that after going to Speedway, he, Brad, and Sara returned to his apartment. Sara and Brad stayed for another two to three hours. He did not have sex with Sara again. When they left, Sara took the moonshine with her, hiding it in her jacket.

{¶ 39} On cross-examination, Ridenour explained that he did not think that telling Detective Trout about going to Speedway with Sara and Brad while he was being interviewed was "inclusive [sic] to me at that moment." As to how he was able to identify McQueary, Ridenour stated that he had never met him before or since and that his attorney found him.

{¶ 40} Ridenour testified that he woke up at some indeterminate time on the morning of October 17 to a knock at his door. It was Brad. Ridenour paid him 25 dollars. Then Ridenour went back to sleep for two or so hours before waking up around noon or 1:00 p.m. When asked why there were not any sheets on his bed when police arrived, Ridenour testified that he took the sheets off the bed himself because Sara and Brad had sex on his bed that night. He agreed he had not told Detective Trout about that either.

### 2. Paul Sarver's Testimony

{¶ 41} Paul Sarver testified that he was a records custodian with the Warren County Sheriff's Office and that an individual named McQueary was released from the Warren County Jail on October 16, 2020, at approximately 10:56 p.m.

### 3. Sierra Nicole Soule's Testimony

{¶ 42} Sierra Nicole Soule testified that she was employed at the same Speedway referenced in Ridenour's testimony. She worked there on Friday, October 16 from 10:00 p.m. to 6:00 a.m the following day. She recalled one evening when a male came in with tattoos all over his face and said he had been released from prison.

### 4. Riley McQueary's Testimony

{¶ 43} Riley McQueary testified that he saw Ridenour at the Speedway after his release from the Warren County Jail. It was the only time he had ever seen Ridenour. He spoke with four people while at the Speedway: a Speedway employee, Ridenour, another male, and "a young lady." McQueary asked Ridenour for a cigarette. He did not recall his conversation with the other male, but "the female kind of butted in" and was trying to solicit him for sex. He declined her solicitation.

{¶ 44} On cross examination, McQueary admitted that he had multiple convictions for theft, falsification, and receiving stolen property. McQueary confirmed that it was the female who approached him about sex and that the males were not involved in that conversation. McQueary could not describe what the female was wearing and did not remember any details about the other male. But he could remember Ridenour.

### C. The Verdict

{¶ 45} Following closing arguments, the court announced its verdict:

> Here's the thing about this case, Mr. Ridenour. It is impossible to reconcile all of the testimonies regarding the people who came in and were witnesses in this case, from [Sara] to [Brad] to the police officers, to Mr. McQueary. Your version of these events made no sense whatsoever, and it's very difficult for me to put a timeline together of what happened, particularly given the inconsistencies and the statements. I'm not really sure what happened when they left, when everybody left the bar. I'm not really sure what happened when all these folks left your apartment, but I will say Mr. Ridenour, I am very confident that I know what happened while they were in your apartment and I believe that the State has met their burden of proof. I do think

that you forced [Sara] to engage in sexual conduct with you, that you compelled her to submit by force or threat of force, so I do find that you are guilty of rape, that being a felony of the first degree.

The court also found Ridenour guilty of the repeat violent offender specification. The court sentenced Ridenour to an indefinite prison term, consisting of a minimum term of 10 years and a maximum term of 15 years in prison. Ridenour appealed and has raised two assignments of error.

## II. Law and Analysis

### A. Manifest Weight of the Evidence

{¶ 46} Ridenour's Assignment of Error No. 1 states:

{¶ 47} THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY ENTERING A JUDGMENT OF CONVICTION FOR RAPE THAT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 48} Ridenour argues that the greater weight of the evidence showed that he did not rape Sara but instead showed that Sara had consensual sex with him in exchange for money.

{¶ 49} A manifest weight of the evidence challenge examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other." *State v. Barnett*, 12th Dist. Butler No. CA2011-09-177, 2012-Ohio-2372, ¶ 14. To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed, and a new trial ordered. *State v. Graham*, 12th Dist. Warren No. CA2008-07-095, 2009-Ohio-2814, ¶ 66.

{¶ 50} In reviewing the evidence, an appellate court must be mindful that the original

trier of fact was in the best position to judge the credibility of witnesses and determine the weight to be given to the evidence. *State v. Blankenburg*, 197 Ohio App.3d 201, 2012-Ohio-1289, ¶ 114 (12th Dist.). An appellate court will overturn a conviction due to the manifest weight of the evidence only in the exceptional case in which the evidence weighs heavily against the conviction. *State v. Zitney*, 12th Dist. Clinton No. CA2020-06-007, 2021-Ohio-466, ¶ 15.

{¶ 51} Ridenour sets forth various arguments challenging Sara's credibility. He points out that she refused a rape examination. He states that her claim that Brad passed out from drinking "just long enough" to allow Ridenour to rape her is not believable. He argues that Sara denied going to Speedway after the sexual encounter, but that McQueary corroborated his account. He contends that Sara's claim of assisting Brad out of the apartment when he was "falling over" is not credible. He asserts that the bruises on Sara's arms are just as indicative of consensual sex as they are of rape. Finally, he points out that Sara claimed that the bruises on her legs were from skateboarding while Brad testified that Sara did not skateboard.

{¶ 52} All of Ridenour's arguments go to the trial court's credibility determinations regarding the various witnesses who testified at trial. However, as discussed above, the trial court is in a better position to assess witness credibility than this court. *Blankenburg*, 2012-Ohio-1289 at ¶ 114. This is because the trial court can listen to the witnesses' testimony and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the testimony. *State v. Miles*, 12th Dist. Butler No. CA2001-04-079, 2002 WL 445041, *3 (Mar. 18, 2002). When conflicting evidence is presented at trial, a conviction is not against the manifest weight of the evidence because the trier of fact believed the prosecution testimony. *State v. Lunsford*, 12th Dist. Brown No. CA2010-10-021, 2011-Ohio-6529, ¶ 17.

{¶ 53} We have reviewed the entire record. There were ample reasons for the trial court to find Sara's testimony credible. Sara's statements to Brad and Patrolman Holmes concerning what happened were consistent with her trial testimony. Her behavior was consistent with someone who had been raped. Brad testified that she began crying upon revealing her account and Patrolman Holmes described her as being "timid," "upset, depressed."

{¶ 54} Sara candidly testified as to what occurred the evening of October 16. She did not attempt to mitigate facts that might not weigh in her favor. For instance, she admitted to consuming alcohol throughout the evening. She also did not attempt to bolster her testimony. She admitted that some of the bruising on her legs was not associated with the sexual assault. Any inconsistency in the trial testimony concerning how Sara acquired the leg bruising was a matter for the factfinder to weigh in assessing her credibility. Sara also did not add unnecessary or irrelevant details into her story that would indicate fabrication.

{¶ 55} Sara's testimony about frantically throwing on her clothes after being raped and then trying to get Brad out of the apartment is consistent with the idea that she may have been too distracted to locate an article of clothing that was left behind and ultimately recovered by police at the apartment. Regarding the bruises on her arm, Sara testified that she believed that the bruises were the result of Ridenour holding her down. From the position of the bruises as depicted in the photographs, her testimony is logical. What is not logical in terms of the location of the bruising is Ridenour's testimony that he and Sara only had "doggie-style" sex. The finder of fact could reasonably conclude that that manner of sex would presumably not involve Ridenour forcefully gripping Sara's arms.

{¶ 56} Contrary to Ridenour's characterization, Sara's testimony was not that Brad fell unconscious "just long enough" for Ridenour to rape her. She testified that Brad continued to be unconscious after the sexual assault and that it took her approximately 10

minutes to get him out of Ridenour's apartment.

{¶ 57} That Sara declined a physical sexual assault examination is understandable given what occurred and given her explanation that she did not want to be touched at that time.

{¶ 58} On the other hand, there were numerous reasons to doubt Ridenour's truthfulness. He failed to mention going to Speedway while being interviewed by Detective Trout. This failure is unexplainable because this meeting at Speedway had allegedly just happened and would therefore have been fresh in Ridenour's recollection during his interview with Detective Trout if it really occurred. It would have provided an obvious and verifiable source of evidence to convince Detective Trout that Sara was a prostitute who had not been raped and that Ridenour was being falsely accused.

{¶ 59} Instead, the first time Ridenour discussed going to Speedway was approximately one year and five months later, at trial. The only person fully corroborating Ridenour's account of what happened was a convicted thief who could not describe either Sara or Brad, yet remarkably recalled Ridenour, who he claimed not to know at all and had not met since. Notably, in Ridenour's account of the meeting at Speedway, Brad approached McQueary to discuss having sex with Sara. In McQueary's version of events, it was Sara who solicited him, and Ridenour and Brad were not involved in the solicitation. A reasonable factfinder could conclude that Ridenour's and McQueary's stories did not line up because they were fabrications. Ridenour also added other details at trial for the first time, such as his claim that Sara and Brad engaged in sexual intercourse on his bed.

{¶ 60} And as Ridenour acknowledged during his interview, it made absolutely no sense that Sara and Brad would accuse him of rape after he allegedly paid them, as agreed, for sexual services. Ridenour's story that he paid Brad 25 dollars the next morning was equally problematic because police viewed security footage indicating that neither Sara nor

Brad left their hotel room that morning.

{¶ 61} Having reviewed the entire record, this is not one of the exceptional cases where the evidence weighed heavily against the conviction. Simply put, Ridenour was not believable, Sara was believable, and it is not surprising that the trial court indicated that it was confident that it knew what occurred in Ridenour's apartment. The trial court did not lose its way in finding Ridenour guilty. We overrule Ridenour's first assignment of error.

**B. Reagan-Tokes Law**

{¶ 62} Ridenour's Assignment of Error No. 2 states:

{¶ 63} THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY ENTERING A SENTENCE THAT VIOLATES THE DOCTRINE OF SEPARATION OF POWERS CREATED BY THE OHIO CONSTITUTION AND IS THEREFORE CONTRARY TO LAW.

{¶ 64} The trial court sentenced Ridenour pursuant to the Reagan Tokes Law, R.C. 2967.271. Ridenour challenges the constitutionality of the Reagan Tokes Law on the basis that it violates the separation-of-powers doctrine. However, Ridenour did not raise this issue with the trial court. As this court has repeatedly held, "arguments challenging the constitutionality of the Reagan Tokes Law are forfeited and will not be heard for the first time on appeal in cases where the appellant did not first raise the issue with the trial court." *State v. Blaylock*, 12th Dist. Butler No. CA2020-11-113, 2021-Ohio-2631, ¶ 7. *Accord State v. Lee*, 12th Dist. Warren No. CA2021-05-047, 2022-Ohio-248, ¶ 34-35; *State v. Bond*, 12th Dist. Butler No. CA2021-08-103, 2022-Ohio-1628, ¶ 28-29; and *State v. Rojas*, 12th Dist. Preble No. CA2021-11-013, 2022-Ohio-2333, ¶ 16. Therefore, given this court's consistent precedent declining to hear arguments challenging the constitutionality of the Reagan Tokes Law in cases where the issue was not first raised with the trial court, we overrule Ridenour's second assignment of error.

{¶ 65} Even if Ridenour had not forfeited this issue by failing to raise a constitutional challenge to the Reagan Tokes Law below, Ridenour's separation of powers argument has already been considered and rejected by this court. *State v. Suder*, 12th Dist. Clermont Nos. CA2020-06-034 and CA2020-06-035, 2021-Ohio-465, ¶ 25 (the Reagan Tokes Law does not violate the separation-of-powers doctrine). *Accord State v. Benjamin*, 12th Dist. Clermont No. CA2021-06-023, 2022-Ohio-427, ¶ 26. More recently, while Ridenour's appeal was pending, the Ohio Supreme Court held, on a facial constitutional challenge as presented here, that the Reagan Tokes Law does not violate the separation-of-powers doctrine. *State v. Hacker*, Slip Opinion No. 2023-Ohio-2535, ¶ 13-25 ("We conclude that allowing the [Department of Rehabilitation and Correction] to rebut the presumption of release for disciplinary reasons does not exceed the power given to the executive branch and does not interfere with the trial court's discretion when sentencing an offender. Therefore, we hold that the Reagan Tokes Law does not violate the separation-of-powers doctrine"). *Hacker* is dispositive of Ridenour's separation of powers argument.

{¶ 66} Accordingly, we overrule Ridenour's second assignment of error.

### III. Conclusion

{¶ 67} The greater weight of the evidence supported Ridenour's conviction. Ridenour's argument challenging the constitutionality of his indefinite sentence under the Reagan Tokes Law is meritless based upon Ohio Supreme Court precedent.

{¶ 68} Judgment affirmed.

S. POWELL, P.J., and HENDRICKSON, J., concur.