[Cite as *State v. Haughn*, 2025-Ohio-5405.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ROSS COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | CASE NO. 24CA15 |
| v. | : | |
| JAMES C. HAUGHN, | : | DECISION & JUDGMENT ENTRY |
| Defendant-Appellant. | : | |

_____

APPEARANCES:

Victoria Bader, Office of the Ohio Public Defender, Columbus, Ohio, for appellant[1].

Jeffrey C. Marks, Ross County Prosecuting Attorney, and Alisa Turner, Assistant Prosecuting Attorney, Chillicothe, Ohio, for appellee.
_____
CRIMINAL APPEAL FROM COMMON PLEAS COURT
DATE JOURNALIZED:11-25-25
ABELE, J.

{¶1} This is an appeal from a Ross County Common Pleas Court judgment of conviction and sentence. James C. Haughn, defendant below and appellant herein, assigns three errors for review:

> FIRST ASSIGNMENT OF ERROR:
>
> "JAMES HAUGHN'S CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE. U.S. CONST., AMEND. V, XIV; OHIO CONST., ART. I, SECTIONS 10, 16."

_____

[1] Different counsel represented appellant during the trial court proceedings.

SECOND ASSIGNMENT OF ERROR:

"THE TRIAL COURT COMMITTED PLAIN ERROR WHEN
IT FAILED TO INSTRUCT THE JURY ON THE
STATUTORY DEFINITION OF 'MENACING FASHION.'
R.C. 2945.11, CRIM.R. 52; U.S. CONST.,
AMEND. V, XIV; OHIO CONST., ART. I.,
SECTIONS 10, 16."

THIRD ASSIGNMENT OF ERROR:

"MR. HAUGHN RECEIVED INEFFECTIVE ASSISTANCE
OF COUNSEL IN VIOLATION OF U.S. CONST.,
AMEND. VI WHEN TRIAL COUNSEL FAILED TO
OBJECT TO THE COURT'S FAILURE TO INSTRUCT
THE JURY ON THE STATUTORY DEFINITION OF
'MENACING FASHION.' *STRICKLAND V.
WASHINGTON,* 466 U.S. 668 (1984)."

{¶2} In October 2023, a Ross County Grand Jury returned an indictment that charged appellant with one count of knowingly causing serious physical harm to a companion animal in violation of R.C. 959.131, a fifth-degree felony. Appellant pleaded not guilty.

{¶3} At appellant's jury trial, Ross County Sheriff's Deputy Blake Weaver testified that he responded to an animal-related call on August 27, 2023 at the home of Matthew Dickson. Weaver observed Mrs. Dickson on the porch with multiple towels "tending to their wounded dog." Weaver described the dog as bleeding, but conscious and calm. When Ross County Dog Warden Pam Longlott arrived about 20 minutes later, Mrs. Dickson removed the towels and Weaver observed a bullet wound in the dog's leg.

{¶4} When the Dicksons took the dog to seek emergency veterinary care, Deputy Weaver and Warden Longlott visited appellant's home to investigate. Appellant "stated that he did shoot the dog because it was running on his property . . . and he was afraid it was going to attack his two grandchildren." Appellant said that his grandchildren were in the driveway and the dog in the middle of the yard. Weaver stated that appellant's yard is a substantial size, and estimated the distance between the dog and the grandchildren at about 60 feet, and estimated that appellant stood about 60 to 70 feet from the dog, and 30-40 feet from the grandchildren.

{¶5} Appellant informed Deputy Weaver that he contacted the Dicksons on August 9 to tell them their dog had been "f*cking with my goats and I won't have it." Appellant also stated that his granddaughters are legally blind and the goats "are all they have." After August 9, appellant stated that the dog had been on his property three more times chasing his goats. "Well tonight, the granddaughters were walking to the steps . . . they were walking down the lane and the dog came around and attacked them. Ok. That's it. The dog has already been harassing my goats - I mean." Appellant stated, "I told him, I warned him, man I don't want to do that. I told him three (3) times. . . I had to do that. I have dogs. But I ain't going to have them attack a little kid. She's seven (7) and fourteen (14). But

they got eye disease. . . retinitis pigmentosa. . . eye disease."

**{¶6}** Appellant stated that he told his granddaughters not to trust any dogs because not all dogs are friendly, and "like I said that's the third or fourth time." When Warden Longlott asked, "Why has nobody called us?," appellant answered, "well, he's my - was my friend." When told that the dog and the Dicksons' children are suffering due to the wounded dog, appellant asked, "why didn't they tie the dog up?" Longlott said, "they should've," but "now, you are in a mess." Appellant asked, "how's that? It was on my property." Longlott replied, "It doesn't always matter. You are supposed to shoot to kill it. That's the law. It lamed it." Appellant responded, "It ran. What do you want me to do? This is in front of my kids or grandkids. I didn't want to do that. I just told you that." Appellant continued, "I mean I did what I thought was right to keep it from going - I couldn't have ran down there and got to them before the dog did. I'm still shaking over this sh*t. I didn't enjoy it at all. . . But I am not going to let him attack one of my grandkids and watch him. I don't know what that dog is going to do."

**{¶7}** Deputy Weaver explained to appellant, "it's an inside dog," and the dog got out around the Dicksons' air conditioner window unit. Appellant asked, "all three (3) times?," "Wow.

That's f*cked.  Now, I feel like an *sshole.  I was doing what I thought was legally right. . . it was on my property running towards the girls and it ain't the first time.  And - wow." Weaver seized appellant's rifle and turned it over to Warden Longlott.

{¶8}  On cross-examination, Deputy Weaver conceded that he did not seek blood spatter material or take any measurements. Weaver further acknowledged that the law says "you've got to keep your dog on a leash," and the Dicksons' dog was not on a leash.  Weaver also acknowledged that Dickson told him that appellant "was crazy and well-armed and that you should bring back-up," but he said that appellant behaved respectfully.

{¶9}  Warden Longlott testified that she had been the deputy dog warden for 10 ½ years.  Longlott's investigation revealed that the dog "got loose through an air conditioner - the side slide thing."  Longlott conceded that Dickson failed to keep his dog confined on his property, that she had not seen the dog running at large prior to August 27, and that she did not cite Matthew Dickson for "dog at large."

{¶10} Matthew Dickson testified that his dog, a 2 ½ year-old pitbull chocolate lab mix, had escaped 3 or 4 times prior to August 17, 2023, but had never bitten anyone or had been aggressive.  Due to the August 27 incident, his dog underwent a leg amputation.  On cross-examination, Dickson stated that he

received an August 9, 2023 text message from appellant that

Dickson's dog "had been going after his goats."  Dickson said he

told his veterinarian that appellant "wasn't shooting to kill.

He admitted that to me."

{¶11} At the close of appellee's evidence, the trial court

denied appellant's Crim.R. 29 motion for judgment of acquittal.

{¶12} Appellant's son-in-law, James Calvano, testified that

his step-daughters, A.M., age 10, and I.M., age 13, suffer from

retinitis pigmentosa, or tunnel vision- "when it's dark they

can't really see at all and it's pretty bad."  Calvano stated

that, due to their vision issues, his step-daughters are "very

scared to really move at any kind of normal even pace.  They

always walk with their hands out.  They are nervous to walk

especially if they are not one hundred (100%) familiar with it.

. . they bumped into us many times even in a house they are

familiar with."  Calvano added that he generally holds their

hand when they walk.

On August 27, Calvano said:

I was taking the girls down to play with the . . . remote
car and . . . as we were getting down to play with it .
. . we probably played with it for not even a minute or
so and a dog approached us.  And I have heard of this
dog in the past and I know what to look for in the type
of dog; and it started to approach us and I told the
girls to start walking back up the driveway and as I am
kind of pushing them towards the driveway; the dog keeps
coming towards us.
And I am trying to shoo the dog away.  The dog kept
coming and that's when I screamed up to the house for

help. . . That is when James came out and he told me to get the girls away and that is when we started moving further up the driveway.

{¶13} When asked if the dog continued to move towards the girls, Calvano replied, "Yes, and that is when I had to yell for the dog to move away and for the dog - that's when we started walking up the driveway and that's when I really started yelling for the help to come out." When asked if the dog still approached the girls as appellant shot the dog, Calvano stated, "it was close enough that it was kind of making me concerned." After appellant shot the dog, it "ran away basically. He was injured and he just ran off." When asked if appellant had time to "physically run over to you and the girls," Calvano replied, "not a chance." Appellee asked Calvano whether he believed at the time appellant fired the shot that the dog posed a danger to the girls, Calvano testified, "at the time I didn't really know what could happen and . . . I was concerned for their safety, yes, because he kept approaching."

{¶14} On cross-examination, Calvano stated that he lived at appellant's home for about a year and a half and had not seen the dog, but had been told that the dog "was a brownish pit kind of looking dog. And to be looking out for it because it has terrorized the goats in the past. And I know it's been seen on the property numerous times." Calvano stated that when he first saw the dog, it was "probably fifteen (15) twenty (20) feet

away. . . He was walking towards our direction.  He wasn't running but, then he started moving more aggressively."  Calvano conceded that the dog did not bark, growl, or show its teeth. Calvano tried to shoo the dog away, but the dog remained undeterred, so Calvano screamed for help, and appellant appeared quickly.  Calvano conceded that some dogs like to chase a remote-controlled car.

**{¶15}** Appellant's friend, Mike Winland, observed the incident and said, "The dog come running up against his little blind kids and he ended up shooting it."  Winland heard appellant's son-in-law scream for help, and within seconds, appellant grabbed his gun and fired it.  Winland stated that appellant would not have had time to run to the dog to protect his granddaughters.  On cross-examination, Winland estimated the dog to be 40 yards from appellant's son-in-law and granddaughters, and said the dog "barked some."

**{¶16}** Appellant's wife, Deejah Haughn, testified that she knows Matthew Dickson and is familiar with Dickson's pitbull. On August 9, 2023, Haughn observed a brown pitbull mix on their property harassing their goats:

> I was standing in our kitchen and I heard our goats like carrying on; and I looked out our window - we have a big picture window and the goats was like - you know down over the hill from where our window is and our porch. And I seen the dog like snapping at the goats - and you know lunging for them and they were just carrying on; so, I yelled through the window but you know I ran out

our front door onto our porch and like yelled.  I first yelled for my husband but he was down at his barn and he didn't get up there on time but, when I yelled the dog did take off.

{¶17} After Haughn told appellant about the goat incident, appellant sent Dickson a text message.  Haughn did not observe the August 27 incident.  On cross-examination, she acknowledged that she did not observe any injuries to her goats from the prior incident.

{¶18} Appellant testified that he is 62 years old and has lived at his property for 50 years.  On August 27, 2023, appellant's neighbor's pitbull entered his property.  Appellant said he had seen the dog on his property 4 to 6 times, and appellant's wife previously observed the dog snap at their goats.  Appellant informed Dickson by text message, and Dickson apologized.

{¶19} On August 27, 2023, after appellant ate dinner with his family and his friend Mike Winland, appellant and Winland stepped outside for Winland to smoke.  "I looked down and seen [the dog] running across the field up towards us. . . I was walking down and I couldn't see him [Calvano] but I could hear . . . James [Calvano]."  The dog "was running right towards them [his granddaughters] at an angle."  Appellant's visually-impaired grandchildren were about 50 yards away, and "I didn't know what the dog was capable of doing."  Appellant had been

target-practicing earlier and his gun remained on his four-wheeler, between him and the barn.  Appellant "trotted" towards the four-wheeler to get his gun.  Appellant said that he did not want to shoot the dog, but "did it because I didn't want the girls to get bit."  Appellant said he believed he had no choice but to shoot the dog, and he did not intend to cripple it and make it suffer.

{¶20} After appellant shot the dog, Deputy Weaver and Dog Warden Longlott arrived.  During cross-examination, appellant estimated the distance between the dog and his granddaughters, "I don't know thirty (30) forty (40) feet, I'm not sure.  They was behind the barn."  Appellant explained, "Well, it's not a barn, it's a little shed."  Appellant stated that he did not believe the shed was open.  Later, appellant estimated that about 28 feet separated the dog from his granddaughters and about 6 to 8 feet separated the dog from his son-in-law.

{¶21} During closing arguments, counsel argued that appellant's conduct met the affirmative defense of privilege because he shot Dickson's dog when it approached "in a menacing fashion or an attitude of attack or threatening or attempting to injure or bite people" pursuant to R.C. 955.28.  The trial court instructed the jury, among other things, about the affirmative defenses of necessity or privilege.  With respect to privilege, the court did not define "menacing fashion or apparent attitude

of attack."

{¶22} After deliberation, the jury found appellant guilty of knowingly causing serious physical harm to a companion animal in violation of R.C. 959.131, a fifth-degree felony.  Appellant filed a written Crim.R. 29 motion for judgment of acquittal and argued that (1) he had proven the affirmative defense of privilege, (2) R.C. 959.131(C) is unconstitutional as applied to him, and (3) R.C. 949.131(B) and (C) violates the Equal Protection Clause.

{¶23} At appellant's April 19, 2024 sentencing, the trial court overruled the motion and stated: "I've considered the motion, it's probably as close as I have been to granting one, but I'm going to decline to do so and overrule it."  Appellant's counsel then asked:

> May I ask, Your Honor, in the alternative to denying it or granting it as stated, I believe one of the powers under Rule 29 could be finding him guilty of an alternative offense.  I would ask the court to consider finding him guilty of the misdemeanor version instead of the felony.

Counsel noted that this violation constitutes a felony offense of violence and disqualifies appellant from firearm possession. After counsel explained the differences between the misdemeanor and felony sections, the trial court stated: "Well, that makes you wonder what the heck is the difference between maim and serious physical harm?"  Counsel replied, "That was the third

point in the motion I made for why I thought it was equal

protection violation, Your Honor.  I thought that they are

essentially the same elements, just different degrees."  After

questioning the difference between serious physical harm and

maiming, the court stated:

> Oh, I'm going to make this one easy for you, don't sweat
> it.  I'm going to still overrule the motion.  I think
> that's a really good argument.  I think the court of
> appeals ought to take a peak at it.  I think the way I
> get that to them is by overruling it and let it go up
> the way it is and then they can come back and say this
> doesn't make sense.  I mean quite frankly, of all of the
> things, of all of the crimes that we've dealt with, this
> one is more of a head scratcher than most of them.  And
> I did find with interest, and I think the court of
> appeals should be aware of it in case they don't review
> the P.S.I., that since this has happened, it appears
> that the dog has gone back on the defendant's property,
> has gone back to the goats, and at one point in time the
> defendant was able to actually call the dog over, the
> dog willingly came to the defendant who tied him up until
> the dog warden got there. . .
>
> I mean, in the grand scheme of things, the dog may be
> limping around on three legs, but it looks to me like
> the dog is more than happy to come see the defendant and
> hang out with the goats. . .
>
> I mean, this is all just crazy.  Okay.  Anyway, Danny
> [assistant prosecutor] that is something that someone
> else in your office can do on the appeal for you, but I
> can't help but wonder what the heck the difference is.
> That's a good argument, Nick [defense counsel].   It
> doesn't work with me, but I think it's a good argument.

At allocution, appellant stated:

> I didn't want to shoot the dog in the first place, it

was chasing my - it was running towards my daughters and I thought, ya know, I just didn't want him reaching them. I mean, it was on my property, I thought I was legally, you know -

The court further noted:

I kept getting the distinct impression that that dog was just strolling along probably just looking for somebody to play or something to do. I didn't get that from the testimony that that dog was a threat necessarily to anybody. However, I can say that I would be concerned if a pitbull was following my children as well; or a dog was following mine. I don't know that I would have done the same thing as you, but I'm not faulting you a whole lot for it.

{¶24} After the trial court considered the record, the pre-sentence investigation report, statements of counsel, appellant's statement, the R.C. 2929.11 principles and purposes of sentencing and the R.C. 2929.12 seriousness and recidivism factors, the court concluded that appellant is amenable to community control sanctions and sentenced appellant to: (1) serve a two-year community control term, (2) pay $4,849.44 restitution to Matthew Dixon, (3) refrain from owning or possessing dogs or cats during his community control term, (4) perform 200 community service hours,(5) serve a two-year postrelease control term if he violates community control, and (6) pay costs. This appeal followed.

I.

**{¶25}** In his first assignment of error, appellant asserts that his conviction is against the manifest weight of the evidence.

**{¶26}** "The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." *State v. Thompkins*, 78 Ohio St.3d 380, at paragraph two of the syllabus (1997). When reviewing whether a conviction is against the manifest weight of the evidence, an appellate court must "examine whether the evidence produced at trial 'attains the high degree of probative force and certainty required of a criminal conviction.'" *State v. Tibbetts*, 92 Ohio St.3d 146, 163 (2001), quoting *State v. Getsy*, 84 Ohio St.3d 180, 193 (1998). In order to do this, an appellate court must examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the fact-finder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Id.; State v. Beasley*, 2018-Ohio-493, ¶ 208, *State v. McKelton*, 2016-Ohio-5735, ¶ 328. "'Weight is not a question of mathematics, but depends on the effect in inducing belief.'" *Thompkins* at 387, quoting Black's Law Dictionary (6 Ed.1990) 1594. "The question to be answered when a manifest weight issue is raised is whether 'there is substantial evidence upon which a jury could reasonably conclude

that all the elements have been proved beyond a reasonable doubt.' " *State v. Leonard*, 2004-Ohio-6235, ¶ 81, quoting *Getsy*, 84 Ohio St.3d at 193-194, citing *State v. Eley*, 56 Ohio St.2d 169 (1978), syllabus.

{¶27} Reviewing courts must also bear in mind that credibility generally is an issue for the trier of fact to resolve. *State v. Issa*, 93 Ohio St.3d 49, 67 (2001); *State v. Murphy*, 2008-Ohio-1744, ¶ 31 (4th Dist.). " 'Because the trier of fact sees and hears the witnesses and is particularly competent to decide "whether, and to what extent, to credit the testimony of particular witnesses," we must afford substantial deference to its determinations of credibility.' " *Barberton v. Jenney*, 2010-Ohio-2420, ¶ 20, quoting *State v. Konya,* 2006-Ohio-6312, ¶ 6 (2d Dist.), quoting *State v. Lawson*, 1997 WL 476684 (2d Dist. Aug. 22, 1997). Thus, an appellate court will generally defer to the trier of fact on issues of evidence weight and credibility, as long as a rational basis exists in the record for the fact-finder's determination. *State v. Picklesimer*, 2012-Ohio-1282, ¶ 24 (4th Dist.); *accord State v. Howard*, 2007-Ohio-6331, ¶ 6 (4th Dist.) ("We will not intercede as long as the trier of fact has some factual and rational basis for its determination of credibility and weight."). Accordingly, if the prosecution presented substantial credible evidence upon which the trier of fact reasonably could conclude,

beyond a reasonable doubt, that the prosecution established the essential elements of the offense, the judgment of conviction is not against the manifest weight of the evidence. *Accord Eastley v. Volkman*, 2012-Ohio-2179, ¶ 12, quoting *Thompkins*, 78 Ohio St.3d at 387, quoting Black's Law Dictionary 1594 (6th Ed.1990) (a judgment is not against the manifest weight of the evidence when " ' "the greater amount of credible evidence" ' " supports it).

{¶28} Consequently, when an appellate court reviews a manifest weight of the evidence claim, the court may reverse a judgment of conviction only if it appears that the fact-finder, when it resolved the conflicts in evidence, " 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Thompkins*, 78 Ohio St.3d at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983); *accord McKelton* at ¶ 328. Finally, a reviewing court should find a conviction against the manifest weight of the evidence only in the " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins*, 78 Ohio St.3d at 387, quoting *Martin*, 20 Ohio App.3d at 175; *accord State v. Clinton*, 2017-Ohio-9423, ¶ 166; *State v. Lindsey*, 87 Ohio St.3d 479, 483 (2000).

{¶29} R.C. 959.131 sets forth the essential elements of the

offense of serious physical harm to a companion animal, fifth-

degree felony.  The statute provides: "(C) No person shall

knowingly cause serious physical harm to a companion animal."

R.C. 2901.22(B) defines when a person acts knowingly:

> A person acts knowingly, regardless of purpose, when the
> person is aware that the person's conduct will probably
> cause a certain result or will probably be of a certain
> nature.  A person has knowledge of circumstances when a
> person is aware that such circumstances probably exist.
> When knowledge of the existence of a particular fact is
> an element of an offense, such knowledge is established
> if a person subjectively believes that there is a high
> probability of its existence and fails to make inquiry
> or acts with a conscious purpose to avoid learning the
> fact.

"Serious physical harm" is defined as:

> (12) "Serious physical harm" means any of the following:
>
> (a)  Physical  harm  that  carries  an  unnecessary  or
> unjustifiable substantial risk of death;
>
> (b) Physical harm that involves either partial or total
> permanent incapacity;
>
> (c) Physical harm that involves acute pain of a duration
> that  results  in  substantial  suffering  or  that  involves
> any degree of prolonged or intractable pain.

Further, "companion animal" is defined in the statute:

> (A) As used in this section:
>
> (1) "Companion animal" means any animal that is kept
> inside  a  residential  dwelling  and  any  dog  or  cat
> regardless of where it is kept. . .

**{¶30}** In the case sub judice, appellant concedes that

appellee proved that appellant knowingly and intentionally shot

the dog on his property and that action resulted in the amputation of the dog's leg. However, appellant contends that R.C. 955.28(A) lawfully permitted him to shoot the dog:

> (A) Subject to divisions (A)(2) and (3) of section 955.261 of the Revised Code, a dog that is chasing or approaching in a menacing fashion or apparent attitude of attack, that attempts to bite or otherwise endanger, or that kills or injures a person or a dog that chases, threatens, harasses, injures, or kills livestock, poultry, other domestic animal, or other animal, that is the property of another person, except a cat or another dog, can be killed at the time of that chasing, threatening, harassment, approaching, attempt, killing, or injury. If, in attempting to kill such a dog, a person wounds it, the person is not liable to prosecution under the penal laws that punish cruelty to animals. Nothing in this section precludes a law enforcement officer from killing a dog that attacks a police dog as defined in section 2921.321 of the Revised Code.

{¶31} Appellant contends that the central question in this case is whether the jury's decision that appellant acted without privilege is against the manifest weight of the evidence. Appellant argues that because he shot the dog before it reached his granddaughters, whether he acted with privilege depends on whether the dog was "chasing or approaching in a menacing fashion or apparent attitude of attack" or that "attempts to . . . otherwise endanger." R.C. 955.28(A). Pursuant to R.C. 955.11(2), "'Menacing fashion' means that a dog would cause any person being chased or approached to reasonably believe that the dog will cause physical injury to that person." Appellant recognizes that this definition is contained in a different

statute, but contends that R.C. 955.11 relates to dog behavior and applies in the case at bar.

{¶32} As noted above, R.C. 955.28 provides an affirmative defense to a charge of knowingly causing serious physical harm to a companion animal if a dog is chasing or approaching a person in a menacing manner. *State v. Hurst*, 1999 WL 152262 (4th Dist. Mar. 12, 1999). "The proper standard for determining in a criminal case whether a defendant has successfully raised an affirmative defense under R.C. 2901.05 is to inquire whether the defendant has introduced sufficient evidence, which, if believed, would raise a question in the minds of reasonable men concerning the existence of such issue." *State v. Melchior*, 56 Ohio St.2d 15, paragraph one of the syllabus (1978). The burden of going forward with the evidence of an affirmative defense and the burden of proof for an affirmative defense is upon the accused. R.C. 2901.05(A).

{¶33} Appellant contends that in the case sub judice, the evidence adduced at trial shows that he shot the dog on his property as it rapidly approached his son-in-law and his two young, visually-impaired grandchildren. Appellant's son-in-law attempted to shoo the dog away and yelled for help when the dog did not stop. Appellant points out that when he intervened, he did so with the knowledge that (1) this dog had previously attacked goats on his property, (2) the dog ran towards his

grandchildren, (3) both grandchildren suffered from a "retinitis pigmentosa", degenerative eye disease that affected their vision, (4) his son-in-law, who was with the children, yelled for help, and (5) appellant could not physically reach the girls before the dog reached them.

{¶34} Thus, appellant asserts that, under the circumstances in this case, both his son-in-law and appellant held a subjective, reasonable belief that the dog would cause physical injury to his son-in-law or to the children, sufficient to prove that the dog "approach[ed] in a menacing fashion." Consequently, appellant contends that he presented sufficient evidence that his actions met the R.C. 955.28(A) affirmative defense of privilege, the jury clearly lost its way, and his conviction is against the manifest weight of the evidence.

{¶35} Appellee, on the other hand, contends that the jury instructions in the case sub judice show, pursuant to R.C. 955.28(A), that the defense also has to establish that (1) the defendant killed or injured the dog at the time of the chasing, threatening, harassment, approaching, attempt, killing, or injury; and (2) if the dog was not killed, the wounds inflicted on the dog were part of an attempt to kill the dog. Appellee also argues that appellant's witnesses accounts are inconsistent regarding their recollection of the events.

{¶36} In particular, appellee contends that appellant failed

to prove that the shooting occurred "at the time of the chasing, threatening, harassment, approaching, attempt, killing or injury," because witness testimony did not demonstrate that the dog behaved in that manner. Appellee points out that, by the time appellant "trotted" over to get his weapon, his grandchildren were behind a shed and 30 feet separated the dog from the grandchildren. Appellee also argues that some question exists as to whether the dog chased or approached the children because Calvano testified he stood between the children and the dog.

**{¶37}** Appellee further contends that, as for the definition of "menacing fashion," both trial counsel and appellate counsel offered definitions and under either, appellant did not satisfy his burden. Appellee points out that trial counsel stated that the term is not defined in R.C. 955.28, but rather is defined in R.C. 955.11 and the introductory paragraph of definitions states, "as used in this section," so that definition is inapplicable to R.C. 955.28. Appellate counsel also cites the rules of common usage pursuant to R.C. 1.42 and refers to *Merriam-Webster* dictionary to use the words presenting, suggesting, or constituting a danger or threat, and the definition of "menace" in the same dictionary states, "a show of intention to inflict harm," with synonyms "threat" and "danger." Appellee also contends that appellant's argument fails under the

dictionary definition as well because he did not prove that the dog exhibited any threatening or aggressive behavior. Finally, appellee argues that R.C. 955.11(A)(2)'s definition requires a "reasonable belief" that the dog will cause physical injury. Appellee claims that, because the grandchildren were behind a shed at the time appellant shot the dog, appellant did not at that time possess a reasonable belief the dog would cause physical injury.

{¶38} Appellee summarizes that (1) on the date that the dog bothered the goats, no evidence existed that the dog harmed the goats, (2) on the date that the dog bothered the goats, appellant's wife yelled at the dog and it left the property, (3) if appellant could have "trotted" to get his gun, he could have "trotted" to his grandchildren to intervene, (4) the trial court noted at sentencing that after it heard the testimony it believed the dog "was just strolling along probably just looking for somebody to play or something to do. I didn't get that from the testimony that the dog was a threat necessarily to anybody," (5) appellant's testimony regarding the number of times the dog had allegedly been on the property previously varied from three to six times, and (6) Calvano, who had lived at the property for over a year and a half, had never seen the dog on the property. Appellee, therefore, contends that the jury simply chose to not believe appellant's version of events.

**{¶39}** Appellant, however, asserts that regardless of the definition used, R.C. 955.28 creates a subjective test that turns on the perception of the person who shoots the dog. Moreover, appellant argues that nothing in the statute requires the dog to bark, growl, or bare its teeth. Instead, appellant points to *State v. Bravard*, 1986 WL 11239 (12th Dist. Oct. 6, 1986) that held, "the legislature's enactment of R.C. 955.28, which provides that a dog that chases a person 'can be killed at any time or place,' is a clear indication of the state's policy that a person chased by a dog has a right of self-defense." *Id.* at *2. Again, appellant reiterates that he proved that (1) he observed the dog run toward his two young, visually-impaired granddaughters, (2) James Calvano, who was with the girls, yelled for help as the dog rapidly approached, (3) the dog did not stop or respond to Calvano's attempt to shoo or deter him, and (4) based on his knowledge of the dog's prior behavior and his granddaughters' disability, appellant reasonably believed that the dog would cause physical injury to Calvano or the girls.

**{¶40}** As set forth above, to decide whether the case sub judice is an exceptional case in which the evidence weighs heavily against conviction, this court must review the record, weigh the evidence and all reasonable inferences, and consider witness credibility. *Martin*, *supra,* 20 Ohio App.3d at 175.

However, a reviewing court must always bear in mind that credibility generally is an issue for the trier of fact to resolve. *State v. Schroeder*, 2019-Ohio-4136, ¶ 61 (4th Dist.); *State v. Wickersham*, 2015-Ohio-2756, ¶ 25 (4th Dist.). Because the trier of fact sees and hears the witnesses, an appellate court will generally afford substantial deference to a trier of fact's credibility determinations. *Schroeder* at ¶ 62. Moreover, the jury has the benefit of seeing witnesses testify, observing facial expressions and body language, hearing voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 2012-Ohio-616, ¶ 14 (6th Dist.); *State v. Pinkerman*, 2024-Ohio-1150, ¶ 26 (4th Dist.). Thus, an appellate court may reverse a conviction only if the trier of fact clearly lost its way in resolving conflicts in the evidence and created a manifest miscarriage of justice. *State v. Benge*, 2021-Ohio-152, ¶ 28 (4th Dist.). Consequently, only in extraordinary circumstances when evidence presented at trial weighs heavily in favor of acquittal, will an appellate court overturn a conviction on the manifest weight of the evidence grounds. *State v. Ridenour*, 2023-Ohio-2713, ¶ 50 (12th Dist.).

{¶41} In the case sub judice, we do not believe that this case is one of those extraordinary cases. Here, the evidence presented at trial does not weigh heavily in favor of acquittal.

Although the trial court pointed out that this is a close case, for this court to conclude that a conviction is against the manifest weight of the evidence the evidence must "weigh heavily in favor of acquittal." *Thompkins*, 78 Ohio St.3d at 387; accord *State v. Clinton*, 2017-Ohio-9423, ¶ 166; *State v. Lindsey*, 87 Ohio St.3d 479, 483 (2000); *State v. Nickell,* 2025-Ohio-1232, ¶ 45. Here, it does not.

**{¶42}** In the case sub judice, after our review of the evidence adduced at trial, we cannot conclude that the evidence weighs heavily against a conviction and the factfinder clearly lost its way. Although appellant contends that the greater number of witnesses testified that appellant had a reasonable belief that the dog approached appellant's grandchildren in a menacing manner, the jury was entitled to assess witness credibility and disbelieve this testimony. A jury's credibility determination may involve more than a simple mathematical comparison of the number of witnesses each party may call to testify at trial. *See Thompkins*, *supra,* 78 Ohio St.3d at 387 (weight of the evidence is not a question of mathematics); *State v. Linder*, 111 Ohio App. 146, 156-157 (1st Dist. 1959)(number of witnesses supporting claim of one or the other parties not to be taken as basis for determination of disputed issue.); *State v. Mayhew*, 71 Ohio App.3d 622, 632 (4th Dist. 1991) (trial court must determine which evidence to believe, giving whatever weight

and credibility to witnesses and evidence it deems appropriate; "the number of witnesses is immaterial."); *State v. Locker,* 2002 WL 975226 (12th Dist. May 13, 2002)(simply because appellant had twice as many witnesses does not necessarily follow that his evidence has more weight than that of the state.); *State ex rel. Brannon v. Turner,* 81 Ohio App. 47, 50 (2d Dist. 1947)(substantial evidence exists to support verdict and manifest weight of evidence not determined by number of witnesses on either side, but by impression their testimony makes upon jury.)

{¶43} In the case sub judice, we do not believe that the evidence adduced at trial reveals that the jury clearly lost its way in resolving conflicts in the evidence and created a manifest miscarriage of justice. Consequently, after our review of the record, we conclude that ample competent, credible evidence supports appellant's conviction. Thus, the jury verdict is not against the manifest weight of the evidence.

{¶44} Accordingly, based upon the foregoing reasons, we overrule appellant's first assignment of error.

II.

{¶45} In his second assignment of error, appellant asserts that the trial court committed plain error when it failed to instruct the jury on the statutory definition of "menacing

fashion." Appellant concedes that this court is limited to a plain-error review because he failed to timely object to the trial court's jury instructions. *See State v. Gasper*, 2024-Ohio-4782, ¶ 14 ("A defendant who fails to object to jury instructions waives all but plain error."); *accord State v. Chasteen*, 2024-Ohio-909, ¶ 10-11 (1st Dist.); *State v. Rodriguez,* 2025-Ohio-53, ¶ 27 (1st Dist.).

**{¶46}** Generally, errors or defects that affect substantial rights may be noticed, even though they were not brought to a trial court's attention. Crim.R. 52(B). A defendant has the burden to satisfy the plain error rule, and a reviewing court may review the entire record when it considers the effect of any error on substantial rights. *State v. Delawder*, 2012-Ohio-1923, ¶ 22 (4th Dist.), quoting *State v. Davis*, 2007-Ohio-3944, ¶ 22 (4th Dist.). For a reviewing court to find plain error, (1) there must be an error, i.e., "a deviation from a legal rule," (2) the error must be plain, i.e., "an obvious defect in the trial proceedings," and (3) the error must have affected "substantial rights," i.e., it must have affected the outcome of the proceedings*. Delawder, id., State v. Barnes*, 2002-Ohio-68. However, a defective jury instruction will not rise to the level of plain error unless, but for the alleged erroneous instruction, a defendant shows that the outcome of the trial would have been different. *State v. Campbell*, 69 Ohio St.3d 38,

41 (1993); *State v. McCown*, 2006-Ohio-6040 (10th Dist.), ¶ 38; *State v. Cunningham*, 2004-Ohio-7007, ¶ 56. *See also State v. Barker*, 2022-Ohio-3756 (9th Dist.)(improper jury instructions do not constitute plain error unless outcome of the trial would clearly have been different). Finally, even if a reviewing court finds plain error, the error should only be corrected where it "seriously affects the fairness, integrity, or public reputation of judicial proceedings" or when necessary "to prevent a manifest miscarriage of justice." *State v. Bond*, 2022-Ohio-4150, ¶ 35. Correction of the error is necessary in this case to prevent a manifest miscarriage of justice.

{¶47} Trial courts are charged with giving juries "complete and accurate" instructions that adequately reflect the issues argued in the case before them. *State v. Sneed*, 63 Ohio St.3d 3, 9 (1992). "A criminal defendant has the right to expect that the trial court will give complete jury instructions on all issues raised by the evidence." *State v. Howard*, 2007-Ohio-6331, ¶ 26 (4th Dist.). Trial courts should ordinarily give requested jury instructions if they are correct statements of law applicable to the facts in the case, and reasonable minds might reach the conclusion sought by the instruction. *Id.*, citing *Murphy v. Carrollton Mfg. Co.*, 61 Ohio St.3d 585, 591 (1991); *State v. Hodges,* 2025-Ohio-2050, ¶ 58 (4th Dist.).

{¶48} When reviewing errors in a jury instruction, an

appellate court must consider a jury charge as a whole.  *State v. Brock*, 2024-Ohio-1036, ¶ 28 (4th Dist.), citing *State v. Huish*, 2023-Ohio-365, ¶ 54 (10th Dist.), citing *Cromer v. Children's Hosp. Med. Ctr. of Akron*, 2015-Ohio-229, ¶ 35-36. However, "[a]n unnecessary, ambiguous, or even affirmatively erroneous portion of a jury charge does not inevitably constitute reversible error."  *Id.*  When a jury instruction incorrectly states the law, a reviewing court will apply a mixed de novo and abuse of discretion standard of review, examine the jury charge as a whole and determine "whether the jury charge probably misled the jury in a matter materially affecting the complaining party's substantial rights."  *Id.*

**{¶49}** In *State v. Woods*, 2016-Ohio-661, (10th Dist.) the court found plain error when the trial court failed to define "purpose" in the jury instructions because the omission prejudiced the defendant and affected the trial outcome. Conversely, in *State v. Blackburn*, 2003-Ohio-605 (11th Dist.), the court concluded that the failure to define "purposely" did not amount to plain error because the lay definition is sufficiently similar to the statutory definition, and the trial outcome would not have been different.  Thus, whether an omission constitutes plain error may depend on the specific facts of a case and whether the omission hindered the jury's deliberations.

{¶50} Appellant contends that Ohio courts have consistently found that the failure to instruct a jury on the statutory definition of an element of the offense constitutes error. Appellant cites *State v. White,* 2015-Ohio-492, ¶ 53, in which the Supreme Court of Ohio held that jury instructions were potentially misleading, because without a proper instruction on the use of deadly force and justification, the court failed to give the jury the instructions necessary to weigh the evidence and to discharge its duty as fact-finder. *Id.* Appellant also cites *State v. Fader*, 2024-Ohio-4921 (2d Dist.). In *Fader,* the Second District held that the trial court's failure to define the terms "reasonable doubt" and "beyond a reasonable doubt" for the jury constituted reversible error under either structural error or plain error analysis. Without the statutory definition – or any definition at all – each juror could require different levels of proof, and that could harm both the accused and the State. *Id.* at ¶ 15-17.

{¶51} Appellant argues that when a court fails to instruct on an element that is not common usage or when a definition is potentially misleading, the court's omission constitutes reversible error. Appellant argues that although the terms "menacing" and "fashion" are words of common usage, their usage in this context is not common - as evidenced by the specific and detailed definition provided in R.C. 955.11(A)(2): "menacing

fashion" means that a dog would cause any person being chased or approached to reasonably believe that the dog will cause physical injury to that person."

**{¶52}** Appellee, on the other hand, contends that simply because the statutory definition appellant cites does not apply to this offense, no plain error occurred. Appellee points out that trial counsel acknowledged that R.C. 955.28 does not define the term "menacing." Further, the statute that defines "menacing fashion," R.C. 955.11(A), states explicitly in the introductory paragraph of definitions *as used in this section.* Therefore, the definition does not apply to the phrase "menacing fashion" as used in R.C. 955.28. In addition, appellee notes that the trial court provided a verbatim recitation of the statute regarding the affirmative defense in its instructions to the jury. Finally, appellee argues that the phrase "menacing fashion" is one of common usage and used in the ordinary sense and that terms of common usage need not be defined for the jury. *See State v. Colonel,* 2023-Ohio-3945, ¶ 49 (4th Dist.)("know or have reasonable cause to believe" is not a technical phrase nor does it have a meaning not generally understood by the average juror); *State v. Gross*, 2002-Ohio-5524, ¶ 104 ("escaping detection, "other offense," and "principal offender," are "terms of common usage" and need not be defined for the jury).

**{¶53}** In the case at bar, we believe that the language used

in the trial court's jury instruction contained terms of common usage, and should be understood by an average juror. The language did not include a technical phrase. The jury apparently understood the phrase as it did not ask for clarification or definition, and appellant does not explain how the jury could have attributed an incorrect meaning to the phrase. *Colonel* at ¶ 49. Rather, it appears that after the hearing the testimony the jury did not believe that the evidence adduced at trial showed that the dog approached the girls and Calvano in a "menacing fashion." Thus, we conclude that appellant failed to establish plain error and we overrule appellant's second assignment of error.

## III.

{¶54} In his final assignment of error, appellant asserts that his trial counsel rendered ineffective assistance of counsel in violation of his constitutional guarantees. In particular, appellant contends that counsel failed to object to the trial court's failure to instruct the jury on the statutory definition of "menacing fashion." However, our resolution of appellant's second assignment of error renders this assignment of error moot.

{¶55} Accordingly, for all of the foregoing reasons, we affirm the trial court's judgment.

JUDGMENT AFFIRMED.

JUDGMENT ENTRY

It is ordered that the judgment be affirmed.  Appellee shall recover of appellant the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Ross County Common Pleas Court to carry this judgment into execution.

If a stay of execution of sentence and release upon bail has been previously granted by the trial court or this court, it is temporarily continued for a period not to exceed 60 days upon the bail previously posted.  The purpose of a continued stay is to allow appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of the proceedings in that court.  If a stay is continued by this entry, it will terminate at the earlier of the expiration of the 60-day period, or the failure of the appellant to file a notice of appeal with the Supreme Court of Ohio in the 45-day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio.  Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of 60 days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Hess, J. & Wilkin, J.: Concur in Judgment & Opinion

For the Court

BY:_____
Peter B. Abele, Judge

NOTICE TO COUNSEL
Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.